# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Computer storage media from the M/V Evridiki, described more particularly on ATTACHMENT A

Case No. 19-235M

**APPLICATION FOR A SEARCH WARRANT**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ______ District of Delaware *(identify the person or describe property to be searched and give its location)*: Computer storage media from the M/V Evridiki, described more particularly on ATTACHMENT A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: Evidence of the commission of violations of: 33 U.S.C § 1908(a) (Knowing Failure to Maintain an Accurate Oil Record Book); 18 U.S.C. § 1519 (Obstruction of Justice); 18 U.S.C. § 1505 (Obstruction of Justice); and 18 U.S.C. § 1001 (False Statements), described more particularly on ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 33 U.S.C. § 1908(a), and the application is based on these facts: and 18 U.S.C. §§ 1519, 1505, and 1001.

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

FILED AUG 27 2019 U.S. DISTRICT COURT DISTRICT OF DELAWARE

[signature]
*Applicant's signature*

SA Brent McKnight, CGIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/27/2019

[signature]
*Judge's signature*

City and state: Wilmington, Delaware

Hon. Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A
## DEVICES TO BE SEARCHED

1. The data stored on the Western Digital HDD SN WMATV4084976, which currently is located at the United States Attorney's Office for the District of Delaware, 1313 N. Market Street, Wilmington, Delaware, that data previously having been seized from a HP Desktop Model DX2200M, SN HUB6420WXT, located in the Ship's Office of the *Evridiki*.

2. The data stored on the Western Digital HDD, SN WMAY01540790, which currently is located at the United States Attorney's Office for the District of Delaware, 1313 N. Market Street, Wilmington, Delaware, that data previously having been seized from a Cougar Desktop, Unknown SN, located in the Engine Control Room of the *Evridiki*.

3. The data stored on the Seagate Model ST200DM001, SN Z4Z2RQYY, which currently is located at the United States Attorney's Office for the District of Delaware, 1313 N. Market Street, Wilmington, Delaware, that data previously having been seized from (a) Acer, SN UDVMZSG028816000090201, located on the Bridge of the M/T EVRIDIKI; (b) Dell L200EBS-00, SN 00343226, located in the Captain's Stateroom of the M/T EVRIDIKI; (c) Dell L200EBS-00, SN 00643226, located in the Chief Engineer's Stateroom of the *Evridiki*; (d) Windows Server, Unknown SN, located on the bridge of the *Evridiki*.

**ATTACHMENT B**

**ITEMS TO BE SEARCHED AND SEIZED**

1. Evidence of the commission of felony violations of: 33 U.S.C § 1908(a) (Knowing Failure to Maintain an Accurate Oil Record Book); 18 U.S.C. § 1519 (Obstruction of Justice); 18 U.S.C. § 1505 (Obstruction of Justice); 18 U.S.C. § 1001 (False Statements); and 18 U.S.C. § 2 (Aiding and Abetting), that occurred during the time period of January 1, 2018, through March 19, 2019.

2. During the period of time from January 1, 2018 through March 19, 2019, evidence pertaining to:

   a. Diaries, logs and records reflecting work-related activities performed by the crew on the Oil Water Separator (OWS) and Oil Content Meter (OCM);

   b. Bilge water and soot collection, management, storage and disposal on the ship;

   c. Operation, maintenance, repair or replacement of the OWS and OCM;

   d. Non-privileged emails:

      i. Between Captain/Master Nikolaos Katsolis and Chief Engineer Nikolaos Vastardis and the following persons: Emmanuel Apostolou, the M/V Evridiki's designated port agent in Greece; the ship's operator and management company, Liquimar Tankers Management Services, Inc.; and the vessel owner, Evridiki Navigation, Inc., and

      ii. That relate to: (a) the operation, maintenance or repair of either the ship's OWS or OCM; (b) activities conducted by the crew in advance of its arrival into the United States on March 10, 2019; (c) the Coast Guard's inspection of the *Evridiki* beginning March 11, 2019 and ending on or

about March 14, 2019; or (d) replacement of the ship's OCM on or about March 14, 2019.

3. Evidence of user attribution showing who used or owned the computers at the time the things described in paragraphs one or two were created, edited, or deleted.

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| IN THE MATTER OF THE SEARCH OF WESTERN DIGITAL HDD, SN WMATV4084976; WESTERN DIGIGAL HDD, SN WMAY01540790; AND SEAGATE MODEL ST200DM001, SN Z4Z2RQYY - ALL CURRENTLY LOCATED AT THE UNITED STATES ATTORNEY'S OFFICE, WILMINGTON, DELAWARE. | Case No. ____________ |
|---|---|

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Brent McKnight, Special Agent, United States Coast Guard Investigative Service, (CGIS), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant: (a) authorizing the examination of property (forensic copies of imaged computers) located on three devices described in Attachment A that are in law enforcement's possession; and (b) the extraction of electronically stored information found on these computers, as described in Attachment B.

2. I have been a Special Agent with the CGIS for approximately 14 years and I am currently assigned to CGIS Resident Agent Office, Philadelphia, Pennsylvania as the Resident Agent in Charge (RAC). I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program and numerous other training programs related to criminal investigations. As a CGIS agent, I have participated in numerous criminal

investigations of individuals who are in violation of laws and statutes of the United States and the United States Code of Federal Regulations have conducted multiple investigations associated with Marine Pollution (MARPOL) violations. Prior to becoming a SA with CGIS, I was a Special Agent with the United States Secret Service (USSS) for approximately 7 years. During my tenure with the USSS I conducted numerous criminal investigations involving various violations of laws and statutes of the United States and the United States Code of Federal Regulations.

3. In March 2019, the United States Coast Guard (Coast Guard) conducted inspection of the *Evridiki*, an 899.5' Liberian-flagged oil tanker. The tanker, which weighs 84,796 gross tons, is owned by Evridiki Navigation, Inc. ("Evridiki Navigation"), a Liberian company, and operated by Liquimar Tankers Management Services, Inc., (Liquimar), with offices in Athens, Greece. On or about March 10, 2019, the *Evridiki* arrived at Big Stone Anchorage, which is located in Delaware Bay, for the purpose of delivering petroleum oil.

4. While I was not personally part of this inspection, information relating to it has been provided to me by other Coast Guard personnel who participated in the inspection. Thus, the statements contained in this Affidavit are based on information provided by other Coast Guard personnel, as well as my own observations and my experience as a CGIS Special Agent.

5. This Affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached search warrant. Thus, I have not set forth each and every fact learned during the course of the investigation.

6. Based upon the facts set forth below, there is probable cause to believe that:

a. Crew members aboard the *Evridiki*: a) knowingly violated the Act to Prevent Pollution from Ships (APPS), by failing to maintain an accurate Oil Record Book (ORB) that documented the discharge overboard of bilge water that had accumulated in the ship's machinery spaces, in violation of 33 U.S.C. § 1908(a); b) obstructed or impeded the due and proper administration of the APPS by the Coast Guard, during the course of an investigation of the ship, in violation of 18 U.S.C. § 1505; c) knowingly concealed and falsified the ship's Oil Record Book, with the intent to impede, obstruct, or influence an investigation of the ship by the Coast Guard conducted pursuant to the APPS, in violation of 18 U.S.C. § 1519; and (d) knowingly and willfully made false statements to the Coast Guard, in violation of 18 U.S.C. 1001.

b. Evidence of these offenses will be found on several computers located on the *Evridiki,* that are specifically identified in Attachment A, which were imaged by the Coast Guard during its inspection of the vessel.

7. Based upon the facts summarized below, on May 16, 2019, a grand jury indicted Evridiki Navigation, Liquimar, and the vessel's Chief Engineer, Nikolaos Vastardis, charging all three with the offenses identified in paragraph 4(a), and with aiding and abetting the same, in violation of 18 U.S.C. § 2. The case has been assigned to the Honorable Richard G. Andrews. Trial has been set to begin on December 9, 2019.

8. Information from computers imaged by the Coast Guard has not been examined. On May 3, 2019, attorneys for the government asked counsel for defendants Evridiki Navigation and Liquimar, for consent to review the computers, subject to certain proposed search protocols. This request was effectively denied - defense counsel provided consent "when/if a Court of

competent jurisdiction finds the seizure of the electronically stored data to be proper." Related, on July 1, 2019, defendants collectively filed a motion to suppress all evidence seized by the Coast Guard in connection with its inspection of the vessel, "including electronic data stored on hard drives and other media duplicated by the government." *See United States v. Nikolaos Vastardis, et al.,* 1:19-cr-00066, D.I. 46. The United States has filed a response to this motion to suppress. *See United States v. Vastardis*, D.I. 59. The motion is pending before Judge Andrews, with argument scheduled for September 4, 2019.

## LEGAL BACKGROUND

9. The United States is part of an international regime that regulates discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL "). MARPOL was enacted into United States law by APPS, 33 U.S.C. § 1901, *et seq*. The regulations promulgated under APPS apply in part to all commercial vessels over 150 gross tons that carry oil in bulk as cargo while operating in United States waters, or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States. 33 C.F.R. § 151.09(a)(5).

10. During the course of normal operation, large oil tanker vessels routinely generate oil-contaminated bilge wastewater. This wastewater is generated when water in the bottom of the vessel (known as the bilge) mixes with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. MARPOL prohibits the discharge of such oily mixtures except where: (a) the oily mixture is processed through approved oil filtering equipment; and (b) the oil content of the effluent ultimately discharged into the sea does not

exceed 15 parts per million (ppm). In practice, prior to discharge, oily mixtures are processed through a pollution control device known as an OWS, which separates water from oil. Processing is monitored by a device connected to the OWS known as an Oil Content Meter (OCM). This device senses the amount of oil remaining in the effluent after processing by the OWS. If the OCM detects an oil content of greater than 15 ppm in the effluent, it sounds an alarm, shuts down the pumps, and/or diverts flow back to the bilges in order to prevent the discharge into the sea of oil in an amount greater than 15 ppm.

11. MARPOL requires that oil discharges be documented in an ORB. Consistent with the requirements of MARPOL, APPS regulations require that an oil tanker of 150 gross tons and above maintain an Oil Record Book Part I (ORB). Entries must be make in the ORB whenever certain machinery space operations occur, including when there is a discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces. 33 C.F.R. § 151.25(d)(4). Each discharge must be fully recorded without delay in the ORB, so that all entries in the book are appropriate to the operation completed. Each completed operation shall be signed by the person or persons in charge of the operation, and each completed page signed by the Master or other person having charge of the ship. 33 C.F.R. § 151.25(h). The Master or other person having charge of a ship required to keep an ORB shall be responsible for the maintenance of such a record. 33 C.F.R. § 151.25(h). Persons, such as the ship's Chief Engineer, can be held liable as a principal for aiding and abetting the knowing failure to accurately maintain an ORB. 18 U.S.C. § 2.

12. It is unlawful to act in violation of MARPOL, APPS, or implementing regulations. 33 U.S.C. § 1907(a). Any person who knowingly violates MARPOL, APPS or implementing regulations commits a Class D felony. 33 U.S.C. § 1908(a).

13. The Coast Guard, an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 522(a) to board vessels and conduct inspections and investigations of potential violations of international and United States law, including MARPOL and APPS. In conducting inspections, commonly known as Port State Control (PSC) examinations, Coast Guard personnel rely on the statements of the vessel's crew and documents, including information contained in the ORB. The Coast Guard is specifically authorized to examine the vessel's ORB to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate operating procedures; whether it poses any danger to United States' ports and waters; and whether the vessel has discharged any oil or oily mixture in violation of MARPOL, APPS, or any applicable federal regulations. 33 C.F.R. § 151.23(a)(3) and (c).

**PROBABLE CAUSE OF VIOLATIONS**

14. On March 11, 2019, the day after the *Evridiki* arrived in the Delaware Bay and moored in Big Stone Anchorage, Coast Guard inspectors boarded the vessel to conduct a routine, previously announced PSC inspection. Upon their arrival, inspectors first examined documentation including the vessel's ORB. After reviewing this documentation, one of the inspectors, Chief Warrant Officer Aaron Studie ("CWO Studie") explained to the ship's Chief Engineer, Nikolaos Vastardis, ("Vastardis") that he wanted Vastardis to perform a test of the vessel's OWS by using the ship's bilge pumps to run bilge water from the Bilge Holding Tank through the vessel's OWS, using the vessel's installed circulation valve so that the bilge water would be recycled back to the Bilge Holding Tank instead of going overboard. CWO Studie and Vastardis then proceeded to the vessel's OWS, where CWO

Studie observed Vastardis and his crew prepare the OWS for the operation. CWO Studie was familiar with the model of the ship's OCM and recognized that prior to the sample line's entry into the OCM there was a valve installed and labeled "SAMPLING." This reddish colored valve is closed when pointing toward the left, in a 9 o'clock position, and fully open when swung straight down, into a 6 o'clock position. CWO Studie noticed that the vessel's crew did not open this sample valve. As the test proceeded, CWO Studie observed that the OCM was reading 0 parts per million (PPM). Aware that the OCM's sample line was closed, CWO Studie looked to Vastardis, who hand signaled two thumbs up to CWO Studie. However, CWO Studie knew the test was not successful because the sample valve was in the closed position and no bilge water was being sampled by the OCM. CWO Studie then pointed out to Vastardis that the sample valve was closed. It was then opened and the OCM continued to remain at 0 ppm. The ship's OCM was equipped with a tube that discharged into a funnel the water that flowed through and emptied out of the OCM. CWO Studie observed that no water was running into the funnel, which meant there was no sample of bilge water flowing into the OCM. Trying to understand why the OCM was not receiving a sample of bilge water, CWO Studie traced the OCM's copper pipe sample line and discovered that it also had a valve, which was in a closed position. Once this second valve was opened, the OCM immediately alarmed over 15 ppm and did not go back below 15ppm. CWO Studie also knew the ship's OCM was equipped with a fresh water sample line, which could be used to flush bilge water from the OCM. At his direction, the crew operated the fresh water line and the OCM returned to 0, 1, or 2 ppm. After the OCM had been flushed with fresh water, CWO Studie had the crew again run a sample of bilge water through the OCM and it again immediately returned to over 15 ppm. He observed that Vastardis kept

trying to adjust the valve labeled "SAMPLING" and the ppm began to drop, but he explained to Vastardis that the valve had to be fully open. The test continued for approximately 45-60 minutes and the crew were unable to get the OCM's meter below 15 ppm without flushing the sensor with fresh water then significantly throttling the sample line until it was nearly shut.

15. CWO Studie then left the engine room and spoke to Chief Warrant Officer David Turman ("CWO Turman"), explaining the problems with the ability of the OWS to operate correctly. CWO Turman advised that he would look at the OWS as a second opinion.

16. CWO Turman then spoke with Vastardis in the Engine Control Room office, where CWO Turman advised of his intention to run a second test of the OWS. He asked for the OWS to run in the recirculation mode so the bilge water would run from the Bilge Holding Tank to the OWS and then back to the Bilge Holding Tank. CWO Turman also was familiar with the ship's OCM and before the second testing observed that the sample valve was in the closed position. When the OWS system was operated for CWO Turman, again it was operated by the crew with the OCM sample valve in the closed position. He then asked to have the sample line opened in order to provide an actual effluent sample of bilge water to the OCM. The crew complied and the OCM monitor quickly rose to above 15 ppm and further to an alarm display. Afterwards, back in the Engine Control Room, CWO Turman discussed his concerns with Vastardis regarding the OWS and the crews' inability to prove proper operation. CWO Turman pointedly asked Vastardis how the sample isolation valves were maintained during OWS operation. CWO Turman asked if the sample isolation valve is open or closed. Vastardis responded, "Open." CWO Turman reiterated the question, referring to the red handle valve in the sample line. Again, Vastardis replied, "Open." CWO Turman

reconfirmed by restating Vastardis' answer back to him and he confirmed the sample valves are open when the OWS is operated.

17. In light of the inoperability of the OWS and attempts by Vastardis to trick inspectors into believing the OWS worked properly, that is, by conducting the test operation of the system with the SAMPLING valve in the closed position, inspectors requested and received approval to conduct an expanded MARPOL examination. At the end of the first day of inspection, Captain Nikolaos Katsolis, the Master of the Evridiki, was told by Coast Guard Inspectors that due to inefficiencies related to the ship's OWS and OCM, the ship was placed on detention and that the inspectors would return to the ship the next day to continue the inspection. Over the following few days, the Coast Guard conducted an expanded examination which included the following:

    a. Inspectors examined the internal components of the OWS.

            i. They found that these components were heavily coated with black oil and soot. Inspectors learned that the presence of soot was likely due to the fact that soot normally held in the soot collection tank was allowed to drain by the crew into the bilge holding tank. This soot was later run through the OWS during normal operations. Attached as Exhibits 1-5 are photographs taken by the Coast Inspectors aboard the Evridiki. Ex. 1 depicts the OWS overall. Ex 2 is a close up of the OCM and depicts a reddish colored sample valve labeled "SAMPLING," which then was near the 8 o'clock position. (If this valve is in the closed position during the operation of the OCM, it receives no sample of bilge water to monitor for ppm. The OCM was removed from the ship by inspectors and was replaced on or about March 14, 2019, by the ship's

management.) Ex 3 depicts the OWS after its top cover was removed and also the heating element after it was removed. Ex. 4 depicts dirty filtering bags from within the OWS. Ex 5 depicts a glass bottle containing a sample of the effluent collected from the OWS by Coast Guard inspectors. It also depicts a white bucket the Inspectors lowered into the Bilge Holding Tank to take a sample of its contents.

ii. The condition of the OWS called into question the OWS's ability to filter out oil and properly process oily material from the vessel's bilge wastewater system.

b. Inspectors examined the recorded data within the ship's OCM. Your affiant's review of this data on an excel spreadsheet showed that between February 8, 2018, and March 8, 2019, the ship's OWS was run on 18 separate occasions for a total of 56.5 hours. Separate ship records indicated that approximately 84,563 gallons of bilge wastewater were processed during these OWS operations. Data from the OCM indicated small variations of ppm levels during these dates of operation. The ppm levels mostly varied between 0-2 ppm during the course of operation and one operation included a ppm level of 8. A review of the manufacturer's operational manual indicated an operational range of 0-2 ppm is indicative of fresh water. Specific to March 8, 2019, just three days before the Coast Guard began its inspection on March 11, 2019, the recorded data within the ship's OCM showed the OCM operated for 2 hours and 51 minutes, during which there was a 0 ppm reading for the majority of the time and it never exceeded 1 ppm.

c. Inspectors further examined the *Evridiki*'s ORB. When examining the ORB, USCG inspectors looked at entries recording when the OWS had been operated:

   i. The focus of this examination was on recent OWS operations - dates when Vastardis was believed to have been on the vessel as its chief engineer. The ORB entries indicated the *Evridiki*'s OWS was recently operated on January 23, 2019, February 16, 2019, February 26, 2019 and March 8, 2019 for a total of 1,140 minutes through 15 ppm equipment in compliance with law. Each of these entries in the ORB were signed by Vastardis.

   ii. While the focus was on recent operations, ORB entries reported similar discharges going as far back as February 2018.

d. On March 13, 2019, USCG inspectors interviewed Vastardis. The approximate 20-30 minute interview was audio recorded. Your affiant was not present but has listened to the audio recording. During the interview, Vastardis said he did not operate the sampling valve in the closed position. He did acknowledged that he previously told Inspectors that when at sea he operated the OCM with the sampling valve in the open position. However, during the recorded interview he said for the first time that he operated the OCM with the sampling valve only partially open, otherwise the system would experience too much pressure, which interfered with the OCM's operation. (During the above-referenced testing of the OWS and OCM on the first day of the inspection by CWOs Studie and Turman, the sampling valve was placed in the fully open position and they observed no such pressure problem. The Inspectors further advise that the OCM is designed by its manufacturer to withstand more than twice the pressure generated by the Evridiki's OWS.)

18. Vastardis is a Greek national and Greek is his first language. English is a second language for him. At one point during the referenced recorded interview, Vastardis requested the assistance of an interpreter. None was available. Having listened to the recorded interview, your affiant's assessment is that Vastardis was able to give responsive answers to questions. Several time he delayed in answering questions and expressed that he did not understand the question. The Inspectors then would repeat and/or rephrase the question and Vastardis would give a responsive answer.

19. Vessels like M/T EVRIDIKI typical have crews that are from multiple nationalities that serve on board. In order for crews to communicate on board a vessel, a vessel is required under SOLAS Chapter V Reg. 14 Para 4 to identify a working language that will be utilized. A bridge log on a vessel, will have a notation listing the working language that will be employed. A review of the M/T EVRIDIKI's bridge log inside the main cover page indicated the vessel's working language as "English". According, Vastardis' employers apparently were convinced that his English was good enough to communicate in English with the other Evridiki crew members.

20. Additionally, during the course of the Port State Control inspection, CWO Studie asked C/E Vastardis to provide various documents, logbooks and certificates for review by USCG. CWO Studie communicated to C/E Vastardis in English when making those requests and C/E Vastardis was able to provide these documents (that are written in English) without delay. In addition to document reviews, CWO also asked the C/E to demonstrate the use of various pieces of equipment some of which are very technical in nature and C/E was able to take task direction and demonstrate what was asked of him. Furthermore, a significant portion of the PSC inspection was completed prior to any interaction with the OWS and

those tasks were completed without issue or complication. C/E Vastardis sometimes asked

CWO Studie for additional information and clarification, prior to completing a task;

however, ultimately C/E Vastardis completed the tasks without termination.

21. Based on its initial and expanded MARPOL inspections, the USCG suspected that the OWS
    on board the *Evridiki* was likely not capable of separating out oil to meet the legal
    requirement. Knowing this, Vastardis defeated the overall OWS system by operating it in an
    impermissible manner as he demonstrated to inspectors, resulting in the discharge of bilge
    wastewater that contained impermissibly high levels of oil. To conceal his illegal operation
    of the OWS, Vastardis made false entries in the ship's ORB, asserting that the bilge
    wastewater was processed in a manner that met legal requirements, when in fact it was not.
    Your affiant agrees with this finding

22. Your affiant believes the evidence shows that the OWS could not have filtered the ship's
    depicted dirty bilge water through its depicted equally dirty OWS to 0-1 ppm on March 8,
    2019, just three days before the Coast Guard inspection began: that the SAMPLING valve
    was closed on March 8, 2019, and the OCM was reading fresh water the entire time; and that
    all four of the relevant ORB entries similarly are false. Your affiant knows that the
    SAMPLING valve, has a ball valve, and need not be entirely open for the OCM to get a
    sufficient quantity of bilge water for sampling. Your affiant submits that the evidence shows
    that on the four ORB dates in question, Vastardis never opened the SAMPLING valve to a
    sufficient degree so that any sample of bilge water was delivered to the OCM and that he lied
    to investigators when he said he operated the OCM with the SAMPLING valve open and
    partially open. In this regard, on or about May 22 and 23, 2019, depositions of 10 Evridiki

crewmembers, including the Captain, were taken. Each of the witnesses testified that Vastardis is a very good chief engineer and the sole operator of the OWS and OCM; is an honest man and/or has a good reputation for honesty; and show a positive concern for the protection of the ocean environment. Several of the crewmen testified that they momentarily observed the OCM while it was operating and that the sample line never was fully open but always cracked partially open.

23. On May 16, 2019, a grand jury sitting in the District of Delaware indicted Evridiki Navigation, Liquimar, and Vastardis, charging them with criminal offenses set forth in paragraphs 6 and 7.

**DEVICES TO BE EXAMINED**

24. As part of its investigation, CGIS Special Agents Rodney Newcomer and Steven Frith imaged several devices located on the ship. Imaging was conducted on March 14th and 19th, 2019, while the *Evridiki* was located at the Breakwater Anchorage in Delaware Bay. Prior consent to image the computers was not given by the owner, operator, or vessel crewmembers. Rather, computers were imaged pursuant the Coast Guard's general authority under 14 U.S.C. § 522(a).

25. Specific computers imaged were as follows:
    a. On March 14, 2019, Special Agent Newcomer imaged the following devices:
        i. Engine Control Room Computer: Seagate Model ST1000DM003, S/N Z9A10WGM. The 1000 GB hard drive was removed from a Cougar desktop, unknown model, located in the engine control room. The image was stored on a 1500 GB Western Digital HDD, Serial Number (SN) WMAY01540790.

  ii. Ship's Office Computer: Western Digital HDD Model WD800JD, S/N WMAM9DP12880. The HDD was removed from a HP Desktop Model DX2200M, S/N HUB6420WXT. The image was stored on a 1000 GB Western Digital HDD, SN WMATV4084976.

 b. On March 19, 2019, Special Agent Steven Frith imaged the following devices, all of which were stored on a Seagate Model ST200DM001, SN Z4Z2RQYY:

  i. Bridge Computer: ACER S/N UDVMZSG028816000090201, Toshiba HDD DT01ACA100, SN 877MPJBNS.

  ii. Captain's Computer: Dell L200EBS-00, S/N 00343226, Micron HDD MTFDDAV256TBN, SN 18281D7D864A.

  iii. Chief Engineer's Computer: Dell L200EBS-00, S/N 00643226, Micron HDD 1100 SATA 256GB, SN 18281D7D876F.

  iv. "Tacomms" Folder from Windows Server 192.168.1.10, located on the Bridge.

  v. "Common" Folder from Windows Server 192.168.1.10, located on the Bridge.[1]

  vi. "Data" Folder from Windows Server 192.168.1.10, located on the Bridge.

26. Imaging was conducted in the following manner:

 a. On March 14th 2019, CGIS SA Newcomer used a forensic duplicator and a direct connection to the HDDs found in the Ship's Office computer (HP Desktop Model

---

[1] In addition to these devices, SA Frith imaged two computers located in the ship's cargo room: (a) Cargo Control Room Computer (data drive), Cougar box, unknown S/N, Seagate HDD ATA ST1000DM003-1SB10C, S/N Serial number: Z9A12GX2: and (b) Cargo Control Room Computer (operating system drive), Cougar box, unknown S/N. RAID 0 Volume, S/N unknown. Given the nature of the investigation which is focused on activities within the ship's Engine Control Room, this affidavit does not seek authority to search these computers.

DX2200M, S/N HUB6420WXT) and the Engine Control Room Computer (Cougar Desktop, Unknown S/N) to create a physical image of these HDDs.

b. On March 19th 2019, CGIS SA Frith used a forensic duplicator and a direct connection to the HDDs found in the Bridge Computer (ACER SN UDVMZSG028816000090201) and Cargo Control Room Computer (data drive), (Cougar box, unknown SN) to create a physical image of these HDDs. On this same date, SA Frith used a forensic live boot disk to capture physical images of HDDs found in the Cargo Control Room Computer (operating system drive) (Cougar box, unknown SN) and Chief Engineer's Computer, Dell L200EBS-00 SN 00643226. On this same date and while booted into the Cargo Control Room Computer using a forensic live boot disk, SA Frith connected to Windows Server (IP 192.168.1.10, physically located on the Bridge) and captured logical images of folders labeled "Tacomms", "Data" and "Common".

27. Once all computers were imaged, the Devices was transferred to CGIS. They are presently located at the United States Attorney's Office for the District of Delaware, 1313 N. Market Street, Wilmington, Delaware. The Devices have been stored in a manner in which its contents are, to the extent material to this investigation, are in substantially the same state as they were when the Devices first came into the possession of the CGIS.

## PROBABLE CAUSE OF EVIDENCE OF VIOLATIONS TO BE FOUND ON SEIZED COMPUTERS

28. There is probable cause that evidence of the violations described above is contained on the Devices described in Attachment A. From my training and experience, and information

obtained from Coast Guard personnel, I am aware that important information is typically maintained on the ship's computer systems. These computers typically contain:

a. Information regarding the level of bilge water within each of the ship's bilge water holding tanks. This information provides valuable insight into the level of bilge water collected by the vessel and subject to discharge.

b. Information showing when waste oil is transferred from the ship to shore side disposal facilities.

c. Information regarding the condition, operation, and maintenance of the ship's engines, which can affect the oil content of the ship's bilge waste and also the volume and rate at which bilge waste accumulates.

d. Email communications between the ship and both the operator of the ship and its shore side representative. These emails often contain parts orders, machinery condition updates, machinery improvement recommendations, and at sea operating problems. They also can include non-privileged communications between the vessel and others (namely the shore side representative and managing company) during the course of any Coast Guard inspection.

29. It appears that computers used on the M/T EVRIDIKI were used in a manner consistent with some of the general uses described above.

a. During the course of the Coast Guard inspection, the vessel's Master Nikolaos Katsolis (the most senior person aboard the ship) provided the following details relating to the ship's computers:

i. The Master and Vastardis had computers in their staterooms that they used to conduct work-related activities. The master's computer was the primary

device for sending/receiving emails. The Chief Engineer managed all aspects of the engine room, which included the OWS.

ii. The server is used to store data that can be accessed from any computer on the network. Data is also independently stored on the individual computers.

iii. The engine room computer is used by the engineering department to store data related to the operation of the engine room including, but not limited to, the operation of the OWS, tank sounding data, maintenance and repair within the engine room, and working hours of the machinery.

b. In a deposition provided on May 23, 2019, Katsolis stated that throughout the Coast Guard inspection, he was in touch with Emmanuel Apostolou, the ship's designated port agent, in Greece. He stated that communications, which related to the cause of the Evridiki's detention and its OWS system, were "every day, all day, almost." He also stated that these communications were by satellite phone and email. He said that after the Coast Guard detained the ship, at the request of the designated port agent, he put Vastardis in direct contact with the designated port agent.

c. During the course of the inspection of the vessel, the Coast Guard observed the computer located within the engine control room. Screen shots of the computer taken during the boarding showed that this computer contained a vessel "Preventative Maintenance System," that in part contained a schedule for maintaining the OWS. This schedule included periodic dates on which the OWS should be checked, inspected and overhauled. It also provided dates on which each of these actions was most recently taken.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on computers. This information can sometimes be recovered with forensics tools.

31. There is probable cause to believe that things that were once stored on the ship's computers may still be found on the Devices, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples,

this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

32. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the ship's computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A, to seek the items described in Attachment B.

Dated: 8/27/2019

Brent McKnight
Special Agent
Coast Guard Investigative Service

Sworn to me this 27 day of August, 2019

Honorable Sherry R. Fallon
United States Magistrate Judge



OWS (overall)



Funnel
Discharge line from OCM
OCM's Monitored Valve
Sample Line and un-monitored valve
Fresh Water Line and un-monitored Valve

GOVERNMENT EXHIBIT 2

OWS internal inspection, thick black oil and carbon mixture

OWS heating element, covered in thick black oil and carbon mixture

GOVERNMENT EXHIBIT 3





Dirty Filtering Material from 1st stage

GOVERNMENT
EXHIBIT
4







Sample of discharge effluent from OWS

Dropping a clean plastic bucket into the bilge holding tank to examine bilge water



Bucket after it had been retrieved from the bilge holding tank

cc: [illegible]